FILED
CLERK, U.S. DISTRICT COURT

APR 1 2003

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| YUPOONG, INC., a Foreign Corporation, | ) ) ) | Case No. CV 03-01098 SVW (JWJx) |
| Plaintiff, | ) ) | ORDER GRANTING PLAINTIFF YUPOONG, INC.'S MOTION FOR PRELIMINARY INJUNCTION. |
| v. | ) ) ) | |
| H & C HEADWEAR INC., a California Corporation, d/b/a KC CAPS, | ) ) ) ) | |
| Defendant. | ) ) ) ) | |

ENTERED ON ICMS

APR - 2 2003

CV

## I.   INTRODUCTION

Plaintiff Yupoong, Inc. ("Plaintiff") manufactures the patented FLEXFIT® baseball cap ("FLEXFIT"), U.S. Patent No. 5,715,540 ("the '540 patent"). Plaintiff seeks a preliminary injunction to prevent Defendant H & C Headwear Inc. ("Defendant") from marketing and selling the allegedly infringing "New Generation NU-FIT™" ("NU-FIT") line of baseball caps. Plaintiff contends that the NU-FIT baseball cap infringes Claim 7 of the '540 patent.

///

1    Defendant argues in Opposition that there are serious doubts as

2    to the validity of Plaintiff's patent, and a preliminary injunction

3    therefore would not be proper.  Specifically, Defendant argues that

4    the '540 patent is invalid based on prior art that allegedly was not

5    before the Patent and Trademark Office ("PTO").  In addition,

6    Defendant contends that the NU-FIT cap does not infringe Claim 7 of

7    the '540 patent.  Lastly, Defendant argues that Plaintiff has not and

8    cannot demonstrate irreparable harm.

9    However, as explained more fully below, Defendant has not made a

10   substantial showing of patent invalidity.  Because Plaintiff has

11   presented sufficient evidence that it will likely prove Defendant's

12   NU-FIT cap infringes Claim 7 of the '540 patent, and because

13   Plaintiff has made an adequate showing of irreparable harm, the Court

14   GRANTS Plaintiff's Motion for Preliminary Injunction.

15

16   II.   **FACTUAL AND PROCEDURAL BACKGROUND**

17   Plaintiff Yupoong, Inc., based in Seoul, South Korea, is one of

18   the largest manufacturers of headwear in the world.  (Cho Decl. at ¶

19   3.)  Since 1998, Plaintiff has manufactured and sold the FLEXFIT line

20   of baseball caps.  (Id. at ¶ 4.)  The FLEXFIT caps are "free-size"

21   caps, which include a multi-size feature that allows the caps to

22   stretch to fit wearers with varying head sizes.  (Id. at ¶ 5.)  The

23   FLEXFIT cap has achieved a great amount of success and is Plaintiff's

24   most successful product.  (Id. at ¶¶ 4-8.)

25   The patent in suit – the '540 Patent – encompasses Plaintiff's

26   FLEXFIT cap.  The sole claim at issue in this Motion, Claim 7,

27   ///

28

-2-

1  focuses on alleged improvements in which the lateral and rear gores[1]

2  of the cap are composed of "uniaxially stretchable material capable

3  of being stretched along a chordial axis."  Claim 7 also covers a

4  sweatband on the interior circumference of the shell, which is also

5  composed of a "uniaxially" stretchable material stretched "only along

6  the chordial axis" of the shell.  Because the FLEXFIT cap is woven of

7  spandex yarn only for weft (i.e. the crosswise direction of the loom)

8  and not warp, the lateral and rear gores and the sweatband of the cap

9  stretch only in the "chordial" (i.e. longitudinal or lengthwise)

10  direction.

11      Defendant H & C Headwear Inc., based in California, sells

12  headwear and other apparel products.  (Ruseckas Decl. at ¶¶ 4, 8-9.)

13  Headwear represents the majority of Defendant's business.

14  (Declaration of John Lee ("Lee Decl.") at ¶¶ 1, 2.)  In fact, 95% of

15  Defendant's 2002 revenue was attributable to headwear.  (Id.)

16  Defendant first began selling stretchable caps in 1999.  (Lee Decl.

17  at ¶ 3.)  In January of 2003, Defendant introduced its "New

18  Generation NU-FIT" caps, which have one-piece stretchable sweatbands.

19  (Cho Decl. at ¶ 10; Ruseckas Decl at ¶¶ 5-10; Lee Decl. at ¶¶ 7, 10.)

20  In addition, the NU-FIT caps have lateral and rear gores that, like

21  the stretchable sweatbands, incorporate spandex only in the weft

22  weave of the fabric.  (Ruseckas Decl. at ¶¶ 6-7; Lee Decl. at ¶ 8.)

23      Plaintiff filed a Complaint for patent infringement against

24  Defendant on February 14, 2003.  On February 24, 2003, Plaintiff

25

26  [1]A gore is a triangular piece of cloth that forms a segment
of the shell of the cap.  See Webster's Third New International
27  Dictionary 980 (1981).  The crown portion of the cap is comprised
of six gores.
28

1  filed a Motion for Preliminary Injunction, which currently is before

2  the Court.

3

4  **III. ANALYSIS**

5      **A.   Legal Standard**

6      The grant or denial of a preliminary injunction pursuant to 35

7  U.S.C. § 283 is within the discretion of the District Court.

8  Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350

9  (Fed. Cir. 2001).  Plaintiff is entitled to a preliminary injunction

10  if it can show: "(1) a reasonable likelihood of success on the

11  merits; (2) irreparable harm if an injunction is not granted; (3) a

12  balance of hardships tipping in its favor; and (4) the injunction's

13  favorable impact on the public interest." Id. (citations omitted).

14  "These factors, taken individually, are not dispositive; rather, the

15  district court must weigh and measure each factor against the other

16  factors and against the form and magnitude of the relief requested."

17  Id. (citation and internal quotation marks omitted).  Furthermore,

18  Plaintiff must establish the first two factors - reasonable

19  likelihood of success on the merits and irreparable harm - in order

20  for the Court to grant the preliminary injunction.  Id.

21      **B.   Likelihood of Success on the Merits**

22      Plaintiff must show, in order to demonstrate a reasonable

23  likelihood of success on the merits, that "in light of the

24  presumptions and burdens that will inhere at trial on the merits,"

25  Plaintiff will likely prove that (1) Defendant's NU-FIT cap infringes

26  the '540 patent, and (2) Plaintiff's claim will likely withstand

27  ///

28

-4-

Defendant's validity challenge.  Id. (citing Genentech, Inc. v. Novo Nordisk, A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).

If Defendant raises a substantial question regarding either infringement or validity - in other words, "asserts an infringement or invalidity defense that the patentee cannot prove 'lacks substantial merit[]'" - the Court should not issue the preliminary injunction.  Id. at 1350-51 (citing Genentech, 108 F.3d at 1364).

### 1.   Patent Infringement

Infringement analysis requires the Court to determine the meaning of the claim and then compare the properly construed claim to the accused device.  See Amazon.com, 239 F.3d at 1350.  "All claims must be construed in light of the specification and the prosecution history."  See Grain Processing Corp. v. Amer. Maize-Products Co., 840 F.2d 902, 908 (Fed. Cir. 1988) (citations omitted).

### a.   Construction of Claim 7

Claim construction is a pure legal question to be determined by the Court.  Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S. Ct. 1384 (1996).  In making its determination, the Court should focus on the language of the claim itself.  See Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed. Cir. 1995).  A term is to receive its ordinary meaning unless the patent specification or prosecution history makes it clear that the inventor intended a different meaning or definition.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1997).  There is a "heavy presumption" that the terms in the claim are entitled to their

ordinary meaning. <u>CCS Fitness, Inc. v. Brunswick Corp.</u>, 288 F.3d

1359, 1366 (Fed. Cir. 2002) (citations omitted).

Claim 7 reads as follows:

> A multi-size cap adapted to accommodate
> wearers having a range of head sizes and
> including a multi-gore shell forming a crown
> portion yet having an appearance of being
> fitted, a visor portion secured to a forward
> edge of said shell and extending outwardly
> therefrom, said multi-gore shell including a
> pair of front gores fixedly secured to said
> visor, and a plurality of lateral and rear
> gores, each of said plurality of gores extending
> from a common apex point, said front gores being
> composed of an unstretchable material which is
> sufficiently rigid to be self-supporting; the
> improvement comprising;
> said lateral and rear gores being composed
> of a uniaxially stretchable material capable of
> being stretched only along a chordial axis of
> said multi-gore shell; wherein said uniaxially
> stretchable fabric is a woven fabric having
> spandex yarn woven therein for weft and having
> yarn having no elasticity for warp, and wherein
> said weft is disposed in a front and rear
> direction of said main body; and
> a sweatband disposed along an interior
> circumference of said multi-gore shell, and
> sweatband being composed of a uniaxially
> stretchable material capable of being stretched
> only along the chordial axis of said multi-gore
> shell.

As Plaintiff explains, the only term specifically defined by the

specification is the "chordial axis," which is defined as follows:

"According to the present invention, gores forming a rear portion of

the crown are uniaxially stretchable in the peripheral direction

(also referred to hereafter as the chordial axis) of the cap

structure. In other words, the uniaxial stretch occurs in the

direction of the edge band of the cap." ('540 Patent, Col. 4, ll. 1-

5.)

1    Furthermore, "warp" is defined in the Webster's Third New

2    International Dictionary[2] as "a series or sheet of parallel yarns or

3    threads set up for textile processing; [specifically]: a series of

4    yarns extended lengthwise in a loom thereby forming the lengthwise

5    threads of a woven fabric . . . ."  Webster's Third New International

6    Dictionary 2592 (1981).  The dictionary defines "warp" as "the thread

7    or yarn that crosses the warp and extends from selvage to selvage of

8    a cloth[.]"[3]  Id. at 2577.  And, with respect to the '540 Patent, a

9    "gore" is "a tapering or triangular piece of cloth[.]"  Id. at 980.

10   The meaning of these terms is undisputed.

11

12                b.    The NU-FIT Cap Infringes Claim 7 of the '540

13                      Patent

14        Plaintiff contends that the NU-FIT cap infringes Plaintiff's

15   patent.  Like the FLEXFIT cap, the NU-FIT cap is a multi-size stretch

16   baseball cap, which has stretchable lateral and rear gores and a

17   stretchable sweatband.  Defendant contends that the NU-FIT cap does

18   not infringe Plaintiff's patent because the lateral and rear gores

19   and the sweatband stretch not only in the "chordial" direction (i.e.

20   in the longitudinal direction), but also diagonally.  As Defendant

21   points out, Claim 7 covers caps that stretch only in the longitudinal

22

23        [2]The Court is permitted to use a dictionary as extrinsic
     evidence to aid in claim construction.  See, e.g., CCS Fitness,
24   288 F.3d at 1366 (citation omitted).

25        [3]The Webster's Third New International Dictionary defines
     "selvage" as follows: "[T]he edge on either side of a woven or
26   flat-knitted fabric so finished as to prevent raveling;
     [specifically]: a narrow border often woven of difference heavier
27   threads than the fabric and sometimes in a different weave[.]"
     Webster's Third New International Dictionary 2062.
28

direction.  The Claim states in pertinent part: "lateral and rear gores being composed of a uniaxially stretchable material capable of being stretched only along a chordial axis of said multi-gore shell." Because the NU-FIT cap stretches diagonally as well, Defendant contends the cap does not infringe Claim 7 of the '540 patent.

However, as Plaintiff points out, the NU-FIT caps are woven in the same manner as the FLEXFIT caps, and any diagonal stretch is due to the fact that the fabric stretches in the longitudinal direction. As explained above, the lateral and rear gores and the sweatband of the NU-FIT caps are made of spandex woven only in the weft direction. (Declaration of Jong Ho Parl ("Park. Decl.") at ¶¶ 3, 5, 6.)  Any diagonal stretch in the sweatband and the lateral and rear gores of the NU-FIT caps (and the FLEXFIT caps) cannot be avoided, as it is a natural result of using a woven fabric for the crown and sweatband material.  (Park Decl. ¶ 7.)

Plaintiff thus argues that "[t]he fact that there is some modest give in other directions, such as diagonal, is not inconsistent with the fabric 'stretching' in only one direction."  (Plaintiff's Reply at 7-8.)  Because Defendant's construction would exclude Plaintiff's own FLEXFIT cap from being covered by the '540 patent, Plaintiff contends that Defendant's construction of the claim should not be adopted.

As the Federal Circuit explains, "it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in [the relevant] field would read the specification in such a way."  Hoechst Celanese

1    Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1581 (Fed. Cir. 1996)

2    (citation omitted), cert. denied, 519 U.S. 911 (1996).  Furthermore,

3    in Modine Mfg. Co. v. United States Int'l Trade Comm'n, the court

4    explains that "a claim interpretation that would exclude the

5    inventor's device is rarely the correct interpretation[.]"  75 F.3d

6    1545, 1550 (Fed. Cir. 1996), cert. denied, 518 U.S. 1005 (1996).

7        Thus, here, because the diagonal stretch in the NU-FIT and

8    FLEXFIT caps is a natural result of the presence of spandex in the

9    weft (but not the warp) weave, and because excluding diagonal stretch

10   from the claim would exclude Plaintiff's preferred embodiment, the

11   Court does not adopt Defendant's construction.  The claim should be

12   construed so as to cover the preferred embodiment of the patent.

13   Because Defendant's NU-FIT cap is manufactured in the same manner as

14   the preferred embodiment of the '540 patent (i.e. the sweatband and

15   the lateral and rear gores of the NU-FIT cap includes spandex woven

16   in the weft direction, but not in the warp direction), based on the

17   record currently before the Court, it appears that Defendant's NU-FIT

18   cap reads on the "well-construed claim."

19

20        Therefore, Plaintiff has made an adequate showing that

21   Defendant's NU-FIT cap will be found to infringe the '540 Patent.

22        **2.   Validity of the '540 Patent**

23        While Plaintiff need not establish the validity of the patent

24   beyond question, Plaintiff must present a clear case supporting the

25   validity of the '540 patent.  See Amazon.com, 239 F.3d at 1359

26   (citations omitted).  A patentee can present a "clear and convincing

27   case" regarding the validity of the patent in suit by showing, for

28

example, that the patent has successfully withstood similar challenges to the its validity or that there is "a long period of industry acquiescence in the patent's validity." <u>Id.</u> (citation omitted).

Furthermore, "[i]n resisting a preliminary injunction [Defendant] need not make out a case of actual invalidity. Vulnerability is at issue in the preliminary injunction . . . . The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." <u>Id.</u> at 1358-59. At this stage, the Court does not resolve the validity question, but rather must make an assessment of the persuasiveness of Defendant's evidence. <u>New England Braiding Co., Inc. v. A.W. Chesterton Co.,</u> 970 F.2d 878, 882-83 (Fed. Cir. 1992) (footnote omitted). After all, "[g]iven the time constraints within which an accused infringer must usually respond with evidence to a motion for preliminary injunction, . . . a fully comprehensive presentation of [the defendant's] defenses cannot reasonably be required." <u>Id.</u> at 883.

Here, Defendant has not made a substantial showing of invalidity. Defendant points out that Claim 7 (which was claim 13 at the time of prosecution) was originally rejected by the PTO as anticipated by the Lipkin '007 prior art patent. The PTO Examiner read the Lipkin '007 patent as having a sweatband in the form of a flap portion that was made from uniaxially stretchable material. After Plaintiff's patent was rejected by the PTO, however, Plaintiff

///

appealed to the PTO's Board of Patent Appeals and Interferences ("the Board").

The Board upheld the PTO's rejection except in one respect – the Board explained that the Claim was patentable:

> [A]lthough [the Lipkin '007 patent] calls ear flap portion 19 an "elongated band" [citation], within the context of these claims it cannot be regarded as a sweatband, which is defined as "a band lining the bottom of the inside of the crown or hat or cap to protect it against sweat from the head." In our view, one of ordinary skill in the art would not consider [ear flap portion 19] to be a sweatband, since it is not a "band" in the sense that a sweatband is, i.e., "a thin flat strip," and does not extend around the total inside circumference of Lipkin's cap.

(Declaration of Raymond L. Hollister ("Hollister Decl."), Ex. M at 216-17 (footnotes omitted).)

The Board further explained that "[i]n view of the lack of disclosure of a sweatband in Lipkin, as discussed above, and the absence of any evidence that the provision thereof would have been obvious, there is no basis in the record to support the rejection of [the claims]." (Id. at 217-18.) Claim 7 was thus patentable because (1) the Lipkin ear flap was not a "sweatband," and (2) there was no prior art before the Board showing that the inclusion of a sweatband in the Lipkin '007 patent would have been obvious.

Defendant contends that the Board ruled that Claim 7 was patentable only because the PTO was not aware of prior art, specifically the Lipkin '523 patent (U.S. Patent No. 3,247,523), which discloses a hat including an ear flap that is secured to, and extends completely around, the lower edge of the cap. Defendant explains that the band will necessarily absorb any sweat forming on

-11-

1  the wearer's head and therefore constitutes a sweatband.

2  (Defendant's Opposition at 12.)

3       While Defendant argues that the ear flap in the Lipkin '523

4  patent "goes all the way around" the cap and is therefore a

5  sweatband, Plaintiff points out that the Board specifically held that

6  an ear flap is not a sweatband.  While the Board did explain that the

7  Lipkin '007 ear flap did not extend completely around the

8  circumference of the cap, this fact alone was not dispositive.

9  Rather, the Board stated that an ear flap cannot be considered a

10 sweatband, which is "'a band lining the bottom of the inside of the

11 crown or hat or cap to protect it against sweat from the head.'"

12 (Hollister Decl., Ex. M at 217.)

13       Plaintiff concedes that the Lipkin '523 patent was not

14 considered by the PTO.  (Plaintiff's Further Reply at 1.)  However,

15

16 as Plaintiff explains, the mere fact the Lipkin '523 patent covers an

17 ear flap that extends all the way around the cap does not transform

18 the ear flap into a sweatband.  In addition, the PTO and the Board

19 considered the Howe patent, U.S. Patent No. 5,153,939, which is

20 discussed in the specification of the '540 patent.  The Howe patent

21 clearly discloses a headband extending completely around the inside

22 of a cap.  (See Third Supplemental Declaration of Mark J. Carlozzi

23 ("Carlozzi Decl."), Ex. B.)  Because a patent with an earflap

24 extending completely around the circumference of a cap was considered

25 by the PTO, the Lipkin '523 patent is cumulative of other art

26 expressly considered by the PTO and therefore is not the "missing

27 link" rendering Claim 7 obvious.

28

-12-

1   Because Defendant's entire validity challenge centers around the

2   Lipkin '523 patent, Defendant has not made a substantial showing of

3   invalidity.

4      **C.   Irreparable Harm**

5      In order for the Court to grant a preliminary injunction,

6   Plaintiff must make a showing of irreparable harm.  "Irreparable harm

7   is presumed when a clear showing of patent validity and infringement

8   has been made."  Amazon.com, 239 F.3d at 1350 (citation omitted).

9   Notwithstanding this presumption, Plaintiff has made a substantial

10   showing of irreparable harm.

11      In Oakley, Inc. v. Sunglass Hut Intl., a case involving

12   infringement of patented sunglass lenses, the court held the

13   following evidence constituted irreparable harm: (1) if the

14   defendants were permitted to continue to sell their blue and green

15   colored sunglass lenses during the pendency of the lawsuit, the

16   defendants would have eroded the plaintiff's exclusivity and goodwill

17   associated with its products; (2) the defendants' infringing products

18   were sold in very close proximity to the plaintiff's patented

19   products; and (3) the defendants intended to release huge numbers of

20   the infringing sunglasses into the marketplace and to wage a large

21   advertising campaign, which would likely have eroded the plaintiff's

22   market presence and its goodwill associated with its patented lens

23   coatings.  61 U.S.P.Q.2d (BNA) 1658, 1668 (C.D. Cal. 2001), aff'd,

24   316 F.3d 1331 (Fed. Cir. 2003).

25      Here, as in Oakley, Plaintiff will suffer from price erosion and

26   loss of market share if Defendant's cap is released.  Specifically,

-13-

Plaintiff contends that the lower-priced NU-FIT caps threaten to undermine sales of Plaintiff's FLEXFIT caps. (Declaration of Byoung Woo Cho ("Cho Decl.") at ¶¶ 12, 13.) In addition, the fact that Defendant sells and markets its caps at the same trade shows where Plaintiff markets and sells its FLEXFIT caps also supports Plaintiff's position. (See Ruseckas Decl. at ¶¶ 5, 8, 13, 14; Lee Decl. at ¶¶ 11, 12.) Furthermore, "the lesser-quality NU-FIT caps threaten FLEXFIT® brand's strong reputation for high quality, a reputation that is critical to Yupoong's relationship with leading brand-name customers such as Nike®, Reebok®, Adidas®, Quicksilver®, Oakley®, and Billabong®." (Plaintiff's Motion at 16 (citing Cho Decl. at ¶¶ 3, 9; Ruseckas Decl. at ¶¶ 11-14).) If Defendant's caps are allowed to flood the market, the sales of NU-FIT caps will cut into Plaintiff's market share and injure Plaintiff's goodwill. (See Cho Decl. at ¶ 10; Ruseckas Decl. at ¶ 14; Supplemental Declaration of Robert J. Ruseckas ("Supplemental Ruseckas Decl.") at ¶ 12.)

The Federal Circuit has held similar evidence supports a patentee's claim of irreparable harm. For example, in <u>Bio-Technology Gen. Corp. v. Genentech, Inc.</u> 80 F.3d 1553, 1566 (Fed. Cir. 1996), the court stated that in addition to finding that the patentee was entitled to the presumption of irreparable harm, "the district court determined that [the patentee] would be harmed if [the alleged infringer] were allowed to enter the market because [the patentee] would lose revenues and goodwill . . . ." Similarly, in <u>Reebok Intl. v. Baker, Inc.</u>, 32 F.3d 1552, 1558 (Fed. Cir. 1994), the court explained: "Harm to reputation resulting from confusion between an

-14-

inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure."

Defendant argues, however, that Plaintiff's alleged delay in bringing this lawsuit weighs against a finding of irreparable harm.[4] The Federal Circuit explains in <u>High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.</u>, that "[a]bsent a good explanation, . . . 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." 49 F.3d 1551, 1557 (Fed. Cir. 1995) (citations omitted). In addition, the district court in <u>Wang Labs. Inc. v. Mitsubishi Elecs. America Inc.</u> held that "[d]elay does not preclude a finding of irreparable harm as a matter of law, [citation], but it is a relevant factor to be considered, [citation], and it may be sufficiently clear evidence to rebut a presumption of irreparable harm, [citations]." 29 U.S.P.Q.2d (BNA) 1481, 1500 (C.D. Cal. 1993).

Defendant argues that the "New Generation NU-FIT" caps, which are at issue in this case, stretch in the same way as Defendant's Style No. 2001 hat introduced in 2001. Defendant contends that both caps - the Style No. 2001 caps and the New Generation NU-FIT caps -

_____

[4]Defendant also explains that Plaintiff's allegations of irreparable harm are essentially allegations related to trademark infringement. Defendant is correct that a patent case turns only on whether the asserted claims literally embrace the accused product. While the alleged harm that relates to trademark confusion therefore is irrelevant to this analysis, Plaintiff does allege harm that is traceable to patent infringement, which is relevant.

stretch in the longitudinal and diagonal direction.  Because
Defendant contends Plaintiff should have sued for infringement in
2001 for the Style No. 2001 caps, Defendant argues that the delay
precludes a finding of irreparable harm.

While Defendant claims that there was a two-year delay in
bringing this lawsuit, as Plaintiff points out, the Style No. 2001
appears not to infringe the '540 patent.  Plaintiff submits the
Declaration of Robert J. Ruseckas ("Ruseckas Decl."), which
establishes that the sweatband of the Style No. 2001 cap stretches
both longitudinally and in an up-and-down direction.  (Ruseckas Decl.
at ¶ 7; Supplemental Ruseckas Decl. at ¶ 5.)  This is also evident
upon examination of the Style No. 2001 cap.  Because these caps
likely do not to infringe the '540 patent,[5] the presence of the Style
No. 2001 caps in the marketplace since 2001 does not establish delay
for purposes of this lawsuit, which concerns the New Generation NU-
FIT cap.

Moreover, because Plaintiff only became aware of the NU-FIT cap
at the January 2003 Imprinted Sportswear show, Plaintiff did not

_____

[5]Defendant explains that the lateral and rear gores of the
Style No. 2001 caps incorporate spandex only into the yarn
forming the weft weave of the material of the cap.  (See Lee
Decl. at ¶ 6.)  While the lateral and rear gores do appear to
infringe Plaintiff's patent, a key component of the '540 patent
is the uniaxially stretchable sweatband, which incorporates
spandex only into the yarn forming the weft weave.  Because the
headband of the Style No. 2001 cap (1) does not appear to be a
sweatband, and (2) stretches in an up-and-down direction as well
as longitudinally, the cap does not appear to infringe the '540
patent.

-16-

delay in bringing this lawsuit.  Plaintiff, therefore, has made an adequate showing of irreparable harm.

### D.   Balance of Hardships[6]

The balance of hardships also favors granting the preliminary injunction in this case.  The Court must weigh the threatened injury to the patent holder if injunctive relief is not granted against the injury to the accused infringer if the preliminary injunction is granted.  Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1457 (Fed. Cir. 1988) (footnote omitted).

Plaintiff explains that because the FLEXFIT caps account for 70% of Yupoong's sales in the United States, (Cho Decl. at ¶ 4), if Yupoong is forced to lower its price to compete with the lower-priced competition, "the losses incurred would irreparably and significantly damage Yupoong's overall financial position."  (Plaintiff's Further Reply at 18.)  In addition, Plaintiff's goodwill and reputation would be detrimentally affected if the injunction is not issued.  (Cho Decl. at ¶¶ 9,10; Ruseckas Decl. at ¶¶ 11, 14.)

Plaintiff further contends that any hardship Defendant may suffer if an injunction is issued is less than the harm Plaintiff will suffer if the Court does not issue the injunction.  And, as the district court in Amazon.com explained, "[t]he balance of hardships does not favor a defendant where the defendant 'took a calculated risk that it might infringe [the plaintiff's] patents.'"  Amazon.com,

---

[6]It is worth noting that Defendant does not address the balance of hardships or public interest prongs of the preliminary injunction analysis in opposing Plaintiff's Motion.

Inc. v. Barnesandnoble.com, Inc., 73 F. Supp. 2d 1228, 1248 (W.D.

Wash. 1999) (citing Smith Int'l, Inc. v. Hughes Tools Co., 718 F.2d

1573, 1581 (Fed. Cir. 1983)), vacated on other grounds, 239 F.3d 1343

(2001). The court in Oakley similarly explained: "The Court does not

doubt that injunction will cause Defendants some hardship. However,

the hardship Defendants allege they would suffer is not unlike any

other party enjoined from infringing a valid patent." 61 U.S.P.Q.2d

at 1668.

Here, too, the alleged hardship Defendant may suffer if the

injunction is granted would be attributable to the "calculated risk"

Defendant took in manufacturing and attempting to sell a product that

likely infringes Plaintiff's patent. Therefore, the balance of

hardships favors granting the preliminary injunction.

**E.   Public Interest**

"In patent cases there is an important public interest in favor

of protecting the rights secured by a valid patent." Oakley, 61

U.S.P.Q.2d at 1668 (citing Hybritech, 849 F.2d at 1458). However,

"[t]ypically, . . . the focus of the district court's public interest

analysis should be whether there exists some critical public interest

that would be injured by the grant of preliminary relief."

Hybritech, 849 F.2d at 1458 (footnotes omitted).

For example, in a case involving the alleged infringement of a

patent relating to an intra-aortic balloon (IAB) catheter, the court

held that "regarding the public interest factor, . . . [the

defendant] has [] made some showing that the public will be harmed by

an injunction in that some physicians prefer [the] defendant's dual

lumen IABs." <u>Datascope Corp. v. Kontron, Inc.</u>, 786 F.2d 398, 401

(Fed. Cir. 1986) (citing <u>Datascope Corp. v. Kontron, Inc.</u>, 611 F.

Supp. 889, 895 (D. Mass. 1985)).

Here, there is no analogous public interest that will be injured

if the Court issues the injunction.  Defendant does not even attempt

to argue that such an interest exists.  The public interest therefore

favors the grant of the preliminary injunction.  As the court in

<u>Oakley</u> held, "[b]ecause there is no 'critical public interest' to

counterbalance the public interest in protecting rights secured by

valid patents, . . . the public interest also favors the grant of the

preliminary injunction."  61 U.S.P.Q.2d at 1668.

**F.   Bond Amount**

Federal Rule of Civil Procedure 65(c) requires a successful

movant for a preliminary injunction to post security "for the payment

of such costs and damages as may be incurred or suffered by any party

who is found to have been wrongfully enjoined or restrained."  Fed.

R. Civ. P. 65(c).

The Court finds that a $250,000 bond is appropriate under the

circumstances of this case.

**IV.  CONCLUSION**

Accordingly, the Court GRANTS Plaintiff Yupoong, Inc.'s Motion

for Preliminary Injunction.  Pending resolution of the trial of this

action, Defendant H & C Headwear Inc., its officers, directors,

agents, representatives, distributors, importers, subsidiaries and

all other persons or business enterprises in active concert or

-19-

participation with them, who receive actual notice of this Order, are hereby enjoined from manufacturing, using, selling, importing into this country, or offering to sell in the United States the line of free-size, stretchable caps that H & C presently is selling and offering to sell under the name "New Generation NU-FIT."

Defendant shall give notice of this Order to any distributors, wholesalers, or resellers located in the United States to whom it has sold or otherwise transferred any "New Generation NU-FIT" caps.

Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff Yupoong, Inc. shall post a security bond in the amount of $250,000 with the Court on or before Monday, April 7, 2003.  This injunction shall be effective immediately upon the posting of the required bond. Plaintiff Yupoong, Inc. shall give notice to Defendant in writing when it has posted the required bond.


IT IS SO ORDERED.


DATED: _4/1/03_

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

-20-